## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

ESTATE OF CHASE DINKEL,
by and through personal representative AMBER TRENT,

      Plaintiff,

v.

CITY OF LOVELAND, COLORADO, a municipality,
BRAD TEMPLEMAN,
MARCUS VASQUEZ,
NELSON SPENCE,
ANDREW MACGEORGE,
BEN HASANI, in their individual capacities,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff the Estate of Chase Dinkel, by and through its personal representative Amber Trent, through counsel of the law firm MAXTED LAW LLC, submit the following Complaint and Jury Demand:

### I.  INTRODUCTION

1.     Chase Dinkel was just 19 years old when he died a tragic and preventable death. He leaves behind a 2-year-old son who will grow up never knowing his father. Chase died in Loveland on March 25, 2024, in a car crash that never should have happened. That evening, multiple Loveland police officers, the Individual Defendants, contacted and took Chase into custody following an altercation at the local Arby's. The Individual Defendants learned Chase was involved in a physical altercation and was the victim of a menacing with a gun. Individual

Defendants observed that Chase was extremely intoxicated, underage, emotionally distraught, and presenting at risk of harm. While speaking with these police officers, Chase handed an adult friend who was present at that time, an Arby's employee, his car keys, and she held out her hand to take them. The Arby's employee informed police "I'll make sure he gets home."

2.    Individual Defendants then kept Chase in custody and under arrest for about an hour, handcuffing him and putting him in the back of a patrol car. During this time Chase's behavior and statements presented as a young man in a dangerous emotional state at serious risk of harm to himself. Chase expressed thoughts of self-harm, including stating he has a "death wish," he banged his head against the interior of the vehicle to the point Defendants considered putting a helmet on him, and Chase's emotions swung wildly, from crying and sullen to yelling and agitated. Chase generally presented as a young man in crisis, totally irrational and intoxicated and unable to ensure his own safety or make rational decisions.

3.    Despite knowing Chase was a clear and obvious danger to himself and others, police did the unthinkable. Individual Defendants obtained Chase's car keys from inside the Arby's, and gave this drunk, distraught, underage teenager the car keys. They released Chase isolated and alone on a cold Colorado night miles from his home, emotionally distressed and at risk of self-harm or harm to others. They knew of the risk – verbalizing the risk more than once – that Chase would get behind the wheel of his car and drunk drive, endangering himself and others in the Loveland community. Shockingly, and in complete disregard for Chase's safety and the safety of everyone driving in Loveland that night, the Individual Defendants went on to take affirmative action to create this very danger.

4.    Defendants had a duty to safely release Chase, who they knew to be dangerously

2

intoxicated, either to a detoxification or other medical facility, to a jail or other safe custody, or to Chase's home where he could have been released into the custody of his mother Amber Trent as a responsible adult. Instead of performing their lawful duties, Defendants made the reckless and shocking decision to release Chase and hand him the car keys, putting Chase and the community in serious danger.

5. About 15 minutes after Chase walked away and police had also left Arby's, Chase walked back to the Arby's parking lot, got into his car with the keys Defendants had handed him, and drove away. Chase was still dangerously intoxicated, in an emotionally distraught state and at risk of self-harm. Chase drove at a high rate of speed through Loveland, as fast as 50-90 miles per hour, and rear ended a vehicle and crashed into a tree, suffering catastrophic injuries including a fatal traumatic brain injury. Two people in the other vehicle struck suffered minor injuries and were briefly hospitalized.

6. After the catastrophic crash, Chase was hospitalized in a coma. His BAC level was 0.152%, almost twice the legal driving limit. His mother Amber Trent and Chase's family rushed to the hospital, in shock and despair, to spend some final moments with Chase before he died. The impact of Chase's death on his family and the Loveland community has been resounding and profound.

7. Individual Defendants, as Loveland Police Department officers, violated Chase's constitutional rights. They failed to ensure he was safely released from their custody as an intoxicated underage teenager at obvious risk of harm. They acted to recklessly put Chase and the public in danger by affirmatively providing Chase with the car keys, releasing him isolated and alone on a cold night miles from home, and giving him the means to get behind the wheel of

his car while knowing he was in danger. And Individual Defendants acted pursuant to Loveland's failed policies, procedures, customs, training, and supervision. No officer was disciplined for their actions, at least one supervisor, Defendant Templeman, was involved and responsible, and the incident was even shockingly used as a training opportunity.

8.     Loveland is liable under § 1983 for a municipal federal constitutional violation, and Individual Defendants are liable pursuant to C.R.S. § 13-21-131 for violation of Chase's state constitutional rights, under which Defendants do not receive the protections of qualified immunity.

## II.  JURISDICTION AND VENUE

9.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988, as well as Colorado state law, including C.R.S. § 13-21-131.

10.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

11.     Supplemental jurisdiction over state claims is conferred by 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and meritorious and the state causes of action arise from a common nucleus of operative facts.

12.     Personal jurisdiction over each of the defendants is conferred under Federal Rule of Civil Procedure 4(d)(1).

13.     Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred.

## III. PARTIES

14. At all times relevant to this Complaint, Chase Dinkel was a resident of Colorado living in the City of Loveland, in Larimer County.

15. Chase Dinkel died unmarried and leaves behind a minor child, K.A. Chase's mother Amber Trent, a resident of Colorado, has been appointed the Personal Representative of the Estate of Chase Dinkel, the Plaintiff.

16. Defendant the City of Loveland is a municipality in Colorado and is responsible for the policies, procedures, customs, practices, and training (collectively referred to herein as "policies") of the Loveland Police Department ("LPD"). Defendant the City of Loveland is referred to herein as "Loveland" or "LPD."

17. At all times relevant to this Complaint, Defendant Brad Templeman was a peace officer acting within the scope of his official duties and employment and under color of state law as a Loveland police officer holding the supervisory rank of Sergeant.

18. At all times relevant to this Complaint, Defendant Marcus Vasquez was a peace officer acting within the scope of his official duties and employment and under color of state law as a Loveland police officer.

19. At all times relevant to this Complaint, Defendant Nelson Spence was a peace officer acting within the scope of his official duties and employment and under color of state law as a Loveland police officer.

20. At all times relevant to this Complaint, Defendant Andrew MacGeorge was a peace officer acting within the scope of his official duties and employment and under color of state law as a Loveland police officer.

21.    At all times relevant to this Complaint, Defendant Ben Hasani was a peace officer acting within the scope of his official duties and employment and under color of state law as a Loveland police officer.

## IV.  STATEMENT OF FACTS

**Chase Dinkel Was A Beloved Young Father With His Entire Life Ahead of Him**

22.    Chase Dinkel was only 19 years old with his whole life ahead of him when he died. He is remembered for having a "heart of gold" and was a kind young man who always tried to help others when needed. At a memorial service, Chase's pastor described him as "hungry for life," always wanting to understand life and his place in it. The photos below show Chase embracing his mother Amber, and Chase with his sister Ashley and brother Killian.



23.    Growing up in Fort Collins and Loveland, Chase enjoyed time outdoors and in the mountains. He was adventurous and an avid skateboarder who enjoyed video games and hanging out with his friends. Chase was nicknamed 'Butterfly Boy' by a younger cousin for a hat he wore with a giant butterfly on it. Chase was known for his silly sense of humor.

24.      Chase loved kids. He would have been a loving father. Chase will never get that opportunity, and his son K.A. will grow up never personally knowing his father, who he knows from photos as "Daddy Chase." Amber has continued to foster a relationship with her grandson, as shown in the photos below:



25.      Dozens of family and friends from the community attended Chase's memorial service. The service was recorded and included a slideshow of family photos, and a number of Chase's family and friends spoke in his remembrance. The service was recorded and is publicly available to view here: Chase Joseph Dinkel | Memorial Service. As the photos below show, Chase's service was packed, with a line of people outside and standing room only in the back, as people came to share in Chase's life and mourning his loss.



26.     Chase had worked numerous jobs, and at the time of his death was working at Big O Tires. He had a plan to enter Job Corps, receive his high school diploma, and earn a mechanic certificate to enter that field. Chase loved working on cars and motorcycles, and he was excited for the next phase of his life.

27.     This heartbreaking photo shows Amber with her son's body for the last time kissing her son goodbye, an experience no mother should have to fathom:



**Defendants Learn Chase Is Dangerously Intoxicated, Underage, And A Danger To Himself And Others**

28. The evening of March 25, 2024, Chase was at Arby's in Loveland, Colorado, where his girlfriend worked. Though underage, he had consumed alcohol and became intoxicated. Chase was hanging out at Arby's, waiting to spend time with his girlfriend, then head to work the next morning at Big O Tires.

29. Chase lived with his mother Amber Trent and his stepfather John by Lake Loveland, about 3 miles from Arby's and about a 5-minute drive from Arby's.

30. That evening at Arby's, a couple of young men entered the fast-food restaurant. After Chase observed the two young men display hostility towards him, Chase responded verbally. The two young men approached Chase, who remained verbal. One of the two young men threw a punch at Chase. The other pulled out what appeared to be a firearm in a menacing fashion. After the punch, a brief altercation ensued and the other two young men fled. Chase continued yelling at the young men as they fled on foot, got into a vehicle, and fled the scene as police were called.

31. Chase remained on scene and spoke with police, explaining that the other young men had pulled a gun on him.

32. Chase was the victim of this assault and menacing—he had been verbal, but the two young men had been the first aggressors both physically by throwing the first punch and by menacing Chase with a handgun.

33. Loveland Police Department ("LPD") Officer Marcus Vasquez was the first to arrive in response to the call for police, and saw Chase walking outside Arby's yelling and

cursing at the suspect's vehicle fleeing the scene. Defendant Vasquez immediately observed Chase was highly intoxicated. Defendant Vasquez smelled a strong odor of alcohol coming from Chase who was physically unstable and slurring his speech at times. His manner of speaking was obviously intoxicated.

34.    Defendant Vasquez was soon joined by LPD Sergeant Brad Templeman, and LPD Officers Ben Hasani, Nelson Spence, and Andrew MacGeorge. All on scene immediately observed Chase was extremely intoxicated, and as events unfolded, they knew he was a danger to himself and others. All Individual Defendants observed Chase was visibly distraught, emotional, confused, slurring, incoherent at times, physically unsteady, and on the whole obviously drunk and at risk of hurting himself and others.

35.    All Individual Defendants – Vasquez, Templeman, Hasani, Spence, and MacGeorge – remained on scene for the entirety of the police encounter and interaction with Chase. As police officers on scene, all Individual Defendants had the ability and duty to intervene at any point during the police encounter and interaction with Chase.

36.    Chase's behavior frustrated the Individual Defendants on scene; for instance, he initially refused to even give his name or identification to the police officers. When the Individual Defendants approached Chase to detain him, Chase tripped and fell backward onto his back, requiring help from officers to break his fall and help him back up. Again, it was immediately obvious to all Defendants that Chase was a drunk teenager.

37.    Throughout their interaction with Chase, all Individual Defendants saw Chase was confused, had difficulty following questions, he was fidgeting and anxious, he jumped between subjects unintelligibly, he had slurred and impaired speech, he cycled between agitation

10

and raising his voice then becoming sullen and quiet and despondent. Combined with the strong odor of alcohol and Chase's behavior, it was obvious to all that Chase was extremely intoxicated and a danger to himself and others – he was not making rational decisions and was unable to care for his own safety.

**"I'll Make Sure He Gets Home."**

38.     While Individual Defendants were on scene, Chase dropped his keys and bent over to pick them up. An adult friend of Chase's—an Arby's employee—then held out her hand and asks Chase to hand over his car keys. The employee took Chase's car keys into her possession and the keys were given to an Arby's manager and stored safely inside Arby's. Defendant Vasquez observed and supported the friend taking Chase's car keys. Defendant Vasquez, with other Individual Defendants observing, verbally agreed Chase should give someone his car keys to prevent him from driving. After taking Chase's keys into her possession, the Arby's employee assured Defendants "I'll make sure he gets home."

39.     If the incident had ended there with the friend holding on to Chase's keys and driving Chase home, Chase would be alive today. Instead, the Individual Defendants made a series of decisions to hold Chase in custody, isolate him from those who would help get him home safely, and then shockingly gave him his car keys back, creating and increasing dangers that he would drive while dangerously drunk and at risk of self-harm and harm to others.

**Defendants Arrest Chase, Handcuff Him And Place Him In Patrol Car**

40.     The Individual Defendants arrested Chase for alleged disorderly conduct and obstruction (for failing to identify himself), handcuffed him, and placed him the back of a police car where Defendants Hasani, Spence, and MacGeorge monitored Chase. All Individual

11

Defendants owed duties of care to Chase because he was under arrest and in their physical custody, which they failed to meet.

41.     In a police car under arrest, Chase's behavior manifested additional obvious, glaring signs that he was intoxicated and at risk of self-harm, in a reckless and dangerous emotional state, putting him at danger to himself and others.

42.     Chase was visibly upset and began crying. Chase's behavior, expressions, and emotional state indicated to the Individual Defendants an alarming and serious risk of self-harm. Chase made statements indicating self-harm, including stating he had a "death wish." Chase banged his head violently against the window and inside of the police car several times. The Individual Defendants observed this and said they may need to put a helmet on Chase.

43.     The Individual Defendants also knew Chase's behavior posed risk of self-harm because he had engaged in an altercation with visibly armed young men who menaced him with a handgun, assaulted him, and fled the scene. Individual Defendants commented it was dangerous for Chase, who was unarmed, to have engaged with the men who assaulted and menaced him.

44.     Chase's extreme intoxication, his behavior, his statements indicating self-harm, and his emotionally distraught state was known and obvious to each Individual Defendant.

**Defendants Gave A Drunk Underage Kid Car Keys On A Cold Night Miles From Home**

45.     At about 10:05pm, after Chase had been under arrest for over an hour, the Individual Defendants jointly agreed to decide to release Chase under the direction and supervision of Defendant Templeman, the Sergeant and ranking officer. Rather than transport Chase in custody to a safe location or his home, or take him to a detoxification facility or

hospital, or other safe location, they released Chase into the cold night, alone.

46.    The Individual Defendants gave Chase a summons for disorderly conduct and obstructing and told him to leave. Chase asked for his car keys and other property; however, those items were in possession of Arby's employees inside the restaurant.

47.    The Individual Defendants then jointly acted to intentionally and in coordination physically obtain Chase's car keys, carry the keys to Chase, and give the car keys to the drunk teenager.

48.    Defendant Templeman directed Defendants Vasquez and Spence to provide Chase his car keys, phone, and other property. Defendants Vasquez and Spence entered the Arby's and physically took the car keys and other property, exited back outside, and provided the car keys to Chase, under supervision and direction of Defendant Templeman. Defendants MacGeorge and Hasani were present and observed this occur.

49.    Chase never would have had the car keys were it not for these Defendants' decisions and affirmative conduct providing them. Chase had been trespassed from Arby's, meaning barred from entry, and he would not have been able to enter to even request his car keys, nor did staff have any intention of providing a drunken teenager with car keys.

50.    Had the Individual Defendants not acted to affirmatively obtain Chase's car keys and bring them to him, this terrible tragedy would never have occurred.

51.    By this time, the Individual Defendants had also separated Chase from his friends who would have helped get him home safely.

52.    Chase told the Individual Defendants he would walk home. However, he was still obviously intoxicated, and Defendants knew Chase lived "all the way by Loveland Lake,"

13

several miles away. It was a cold night in Colorado, with the temperature below freezing, in the 20s. The Individual Defendants had pulled Chase's information, they knew his address—they knew it was miles away, and it would take Chase an hour to walk home, and that it was extremely unlikely Chase would simply walk all the way home voluntarily, in the cold. To the contrary, Individual Defendants consciously considered and knew it was highly likely Chase would return to his car and drive away drunk, yet still acted as they did in reckless disregard of the dangers.

53. When they released Chase into the frigid night, he was still extremely drunk, confused, upset, and at risk of self-harm and harm to others.

54. The Individual Defendants knew Chase was dangerously intoxicated. They described Chase as "hammered", "plastered", "highly intoxicated", and other terms, fully conscious that Chase was a danger to himself and others in this extremely inebriated state.

55. The Individual Defendants knew Chase was so intoxicated during the incident he stated he needed to vomit at one point.

56. The Individual Defendants knew that giving Chase his car keys presented a grave and obvious risk he would drive drunk and potentially kill himself or others, particularly in his distraught emotional state in which he'd expressed a "death wish."

57. Defendant Vasquez verbalized what all Defendants knew, which was that Chase was a risk to drive off, get into a car accident, and kill someone. Shockingly, rather than take responsibility as they should have as police officers, Defendant Vasquez—in coordination with all Individual Defendants who acted jointly and in agreement—seemed to try to shirk law enforcement responsibility upon fast food restaurant staff. Defendant Vasquez, along with the

other Individual Defendants, told Arby's staff "not to let him [Chase] drive off because I don't want him to go and get into a car accident and kill someone." Individual Defendants knew Arby's staff had no control over Chase driving, would likely not even see Chase drive away if he did, and that it would do nothing to reduce the dangers presented.

58.    Individual Defendants also learned Chase had struggles with emotional control, and had been through anger management as a teenager. In his intoxicated, emotional state, they knew this indicated further that Chase's emotional state put him at serious, obvious risk of actions that put himself or others in danger.

59.    Shockingly, the Individual Defendants, acting in concert, went on to take affirmative action to create this very danger. By physically taking Chase's car keys from Arby's staff, providing them to Chase, and releasing Chase alone into the cold night, the Individual Defendants affirmatively acted to create and increase known and obvious risks that Chase would drive drunk and harm or kill himself or others.

60.    The Individual Defendants were keenly aware of the obvious risks Chase would drive if given the car keys and released in this fashion. Rather than taking action for Chase's safety and the safety of the public, they asked Chase "please don't drive man" when handing him the car keys, recognizing the obvious risk out loud that Chase would drive drunk.

61.    The Individual Defendants knew Chase would not walk home and would likely return to Arby's to drive. Instead of taking appropriate action such as leaving his keys safely inside the Arby's in possession of a responsible adult or simply driving Chase the 5 minutes it would have taken to drive him to his home and release him safely to his mother's care, Defendants told Arby's staff to call them if Chase returned to the parking lot to get his car. But

15

the Individual Defendants knew Arby's staff—fast-food employees—had no duty or ability to monitor Chase's activities or perform law enforcement duties.

62.     Chase's conduct also made obvious he would likely drive off drunk. After giving him the car keys, Chase continued to hover around the vehicle, returning several times to try to get property. He even asked the Individual Defendants if he could move his car—obviously indicating an intention to drive it.

63.     It was obvious to Individual Defendants that Chase was still drunk, intended to drive if given the opportunity, and was stalling to see if police would leave and allow him the chance to drive his car away.

64.     Individual Defendants also knew Chase had told them he had work the next morning, further indicating likelihood he'd attempt to drive his car home.

65.     The Individual Defendants consciously knew what was obvious given the circumstances, that there was a serious risk—that it was in fact glaringly obvious—that Chase would return to Arby's after police left, get into his car, and drive off in an intoxicated and extremely dangerous state of mind.

**Chase Died In Drunk Driving Crash Minutes After Police Release Him Alone With Car Keys**

66.     About 15 minutes after walking from Arby's, Chase returned, got into his car (police had left the scene by that point in time), and drove away. It was about 10:30pm.

67.     While speeding down Eisenhower Boulevard in Loveland, Chase collided into a tree head on, also striking a vehicle. Chase was still distraught and emotional, reportedly on the phone with his girlfriend at the time.

16

68.    Chase's actions constituted self-harm, an act of private violence, ending his own life by driving while intoxicated at a high rate of speed, not wearing a seat belt, ultimately crashing and killing himself.

69.    Two people in the other vehicle suffered minor injuries from the crash.

70.    An autopsy and toxicology investigation found Chase's blood alcohol  was nearly twice the legal limit, at 0.152%.

71.    Chase was treated on scene and transported to the hospital by emergency medical providers.

72.    Chase was taken to the hospital and intubated but suffered a non-survivable brain injury. He had multiple fractures, respiratory failure after trauma, splenic laceration, and traumatic pneumothorax. The impact of the accident was so strong that a CT scan of the head and neck found teeth and tooth fragments inside his throat and esophagus.

73.    His family arrived in the middle of the night after hearing the terrible news of Chase's car crash and his hospitalization.

74.    Chase's family endured the pain of Chase's removal from life support due to non-survivable traumatic brain injury, and he was pronounced dead on March 26, 2024, around 8:00am.

**Defendants Vasquez And Templeman Consciousness Of Guilt On Scene Of The Crash**

75.    Individual Defendants and other LPD supervisors displayed consciousness of guilt regarding the police actions that led to this unnecessary death.

76.    Defendant Vasquez arrived on scene of Chase's deadly accident, and right away recognized Chase and the car. He acknowledged the fatal consequences of their actions: "Shit.

17

This is the guy we told not to fucking drive. God. God dang it. No. This is the guy we just arrested. At the Arby's, that I told not to drive."

77. As Defendant Vasquez expressed his horror that Chase, who they'd just arrested, was in this terrible crash, Defendant Templeman walked up and on Vasquez's body worn camera told him, "watch your language," while indicating and looking at Vasquez's body worn camera in an expression of guilt.

78. Defendant Templeman's tone of voice, expression, and statement to "watch your language" as Defendant Vasquez admitted his concerns, was intended to convey to Defendant Vasquez to refrain from making statements that could inculpate police or show them responsible for this tragedy.

79. Defendant Templeman went on to mute his own body worn camera at various points while on scene of the crash as he discussed the events with other officers, in further evidence of his consciousness of guilt and desire not to be recorded.

80. While on scene of the crash, Defendant Templeman repeatedly emphasized to other officers that Chase had been "hammered" and "highly intoxicated" based on his personal observations of Chase at Arby's, and took pains to ensure officers obtained his blood alcohol for the crash investigation.

81. These Defendants' actions show they knew they were responsible for causing Chase's death, and wanted to minimize or shirk that responsibility.

82. Defendant Templeman's conduct showed a person more concerned with blaming Chase for his own death due to intoxication, rather than acknowledging his own decisions in causing these events.

18

**Defendant Templeman's False Statements And Consciousness Of Guilt Speaking With Chase's Grieving Family**

83.     Chase's mother Amber Trent, his stepfather, father, siblings, and other family rushed to the hospital in the middle of the night when they heard the terrible news. The family gathered, shocked, and began asking questions of police.

84.     Defendant Templeman spoke with Chase's family and made a number of false statements, and deflecting statements, confirming his own consciousness of guilt over his liability for causing this preventable tragedy.

85.     Defendant Templeman told Amber a verbal account of the evening's events at Arby's and then Chase's death in the crash. In doing so, Defendant Templeman intentionally omitted telling Amber that he and his fellow officers made the deadly decision to go into Arby's, get Chase's car keys, and provide them to Chase. Instead, Defendant Templeman initially misled Amber to believe that Arby's staff had returned Chase his car keys, which was untrue.

86.     Defendant Templeman also falsely suggested to Amber that Chase was not dangerously intoxicated when he and his fellow officers released Chase, which was untrue. Chase remained extremely intoxicated when Individual Defendants released him, which was also shown by his blood alcohol level which measured at nearly twice the legal limit.

87.     Defendant Templeman falsely informed Amber that Chase "wouldn't talk to us much" while he was arrested, which was also untrue. Chase made numerous statements over the course of an hour, including emotionally distraught statements about having a "death wish," he was extremely upset and emotionally unstable, swinging from agitated to sullen. Chase made a significant number of statements to officers that made obvious he was in no condition to be

19

released into the night with his car keys.

88.     Defendant Templeman went on to falsely imply to the family that he had no choice but to release Chase. Defendant Templeman invented several false justifications for this. He claimed he had no legal basis to continue to hold Chase in custody, a false statement because he could have held Chase for the alleged criminal conduct, or due to Chase's level of intoxication.

89.     At the hospital as Chase lay dying, Chase's family members expressed shock and anger toward Defendant Templeman upon learning of his and the other police officers' conduct leading to Chase's death as alleged herein. Defendant Templeman went on to continue to attempt to deflect responsibility and make misleading and false statements, showing his own awareness of guilt and responsibility in causing these events.

90.     Defendant Templeman also falsely claimed he had no legal basis to transport Chase to the jail or other safe location. This was also untrue, as there was probable cause allowing the Individual Defendants to take Chase to jail for booking, or to transport him to other location to be held in custody for alcohol incapacitation, or for his own safety.

91.     Defendant Templeman also falsely suggested he had no other option, when in fact he had a legal ability and duty to hold Chase in protective custody due to being an intoxicated underage teenager who was obviously incapacitated, under Colorado law.

92.     Defendant Templeman also intentionally misled Amber and the family by suggesting he and his fellow officers had no ability to have simply transported Chase home while he was in custody. In fact, Colorado law specifically authorized the Individual Defendants to transport Chase home while he was still in custody and already in the back of a patrol car,

20

handcuffed. Just a 5-minute drive to release Chase home would have prevented this tragedy.

93.     Defendant Templeman misleadingly withheld from Amber and the family that he also had the ability to have simply called Amber or another responsible adult, and released Chase to the custody and care of that responsible adult, pursuant to Colorado law and LPD policy.

94.     Defendant Templeman's efforts to obscure the truth, his false statements, his awkward attempts to deflect responsibility, his guilty and defensive tone of voice in these discussions and his facial expressions in body worn camera—this conduct shows his consciousness of guilt at his responsibility, and his fellow officers' responsibility, in causing Chase's preventable death.

95.     Defendant Templeman, like Defendant Vasquez and the other Individual Defendants, knew they should have ensured Chase's safety by either taking him to a detox or medical facility, transporting him home to release him to the custody of a responsible adult, transporting him to jail if necessary, or any other safe course of action instead of releasing Chase into the night with his car keys.

**Individual Defendants Violated Their Own Policy Of Releasing Intoxicated Parties**

96.     Individuals Defendants, and Defendant Loveland, knew that liability can result from releasing intoxicated parties. It is standard practice for Loveland police to require a family member or other responsible third party to sign a release and "waiver of liability" form to take responsibility for an intoxicated person. This release requires the third party to "accept full responsibility" for the actions of the intoxicated person for "the next 8 hour period following the time of said accused's release and agree that the accused party will not drive during this eight (8) hour period."

21

97.     The release further states that in so agreeing, "I relieve the Loveland Police Department of all responsibility for said accused's actions" and that the party takes this responsibility of their own free will.

98.     As this waiver of liability clearly indicates, Loveland police require private parties to take responsibility for intoxicated parties and even to take responsibility for the actions of intoxicated parties, including ensuring they do not drive, prior to releasing the intoxicated party.

99.     Each Individual Defendant knew about this form and the reasons for using it. The Individual Defendants and Defendant Loveland knew there is a serious risk of liability—*i.e.,* death or injury—in failing to ensure someone takes responsibility for an intoxicated party.

100.     The Individual Defendants and Defendant Loveland also knew, as the form indicates, that intoxicated parties present serious liability risks, *i.e.*, harm to themselves or others, and that specifically ensuring the party does not drive is critical.

101.     The Individual Defendants as professional and licensed police officers, who also had Chase in their custody, had greater duties of care than an ordinary private citizen.

102.     The Individual Defendants had a duty to release Chase safely either to a responsible party similar to the form and LPD policy, or to safely transport him to a detox or other suitable location for his own safety and the protection of the public. They failed to meet this duty in shocking and reckless disregard for the known and obvious risks.

**Defendants Violated Colorado Statutes And Duties Of Care Toward Chase**

103.     By contacting Chase and taking him into custody, the Individual Defendants owed duties of care to Chase under both the state and federal constitutions, as well as Colorado statutes, which they violated.

104.     The Individual Defendants had constitutional duties to care for Chase as an intoxicated individual under arrest and in custody, and to ensure his safety, rather than increasing and affirmatively acting to worsen risks to him as they did in this case.

105.     The Individual Defendants also had a duty under Colorado's Emergency Commitment statute to keep Chase in custody or transport him to a detoxification facility or other medical facility, which they violated in reckless disregard of the consequences.

106.     Under state law, the General Assembly proclaimed that the "tragic" impact of substance abuse and alcohol intoxication merited a "locally oriented" approach to the problem, and focused on treatment to address intoxication, particularly where an intoxicated person is a danger to self or others. C.R.S. § 27-81-101(1).

107.     The duty for law enforcement to take protective measures is mandatory under state law:

> When a person is **under the influence of or incapacitated by substances** and is **clearly dangerous to the health and safety of the person's self or others**, law enforcement authorities or an emergency service patrol, acting with probable cause, **shall** take the person into protective custody in an approved treatment facility. **If no such facilities are available, the person may be detained in an emergency medical services facility, or jail**, but only for as long as may be necessary to prevent injury to the person's self or others or to prevent a breach of the peace.

C.R.S. § 27-81-111(1)(a) (emphasis added).

108.     The statute further specifies that if a person is "intoxicated by alcohol," officers may alternatively transport the intoxicated person to their "home or like location" to ensure their safety. *Id.*

109.     Chase met the requirements of the Emergency Commitment statute, and should

have been transported to a detox or other similar medical facility, or if necessary a jail, or his home, to reasonably ensure his safety.

110. Chase was undoubtedly "incapacitated by alcohol" as defined by the statute, because his judgment was severely impaired to a degree he was incapable of realizing or making rational decisions regarding his need for help or basic personal safety, and because he lacked sufficient understanding or capacity to make rational decisions about himself or his safety. C.R.S. § 27-81-102(9).

111. The Individual Defendants knew Chase met this definition and should have been transported to a detox facility, failing to perform this duty.

112. The Individual Defendants knew Chase was intoxicated and incapacitated by alcohol, his judgment was impaired, he was making irrational decisions, he was not able to act for his own basic safety, he presented a serious risk of self-harm, and he lacked ability or understanding to make rational decisions. The Individual Defendants had a duty they failed to meet, to transport Chase either to a detox or other medical or appropriate facility or release him to his home and care of a responsible adult, or some other action to ensure Chase's safety.

### Failure To Intervene

113. Each of the Individual Defendants personally participated in the conduct and engaged in affirmative actions individually, as well as jointly and in coordination and agreement with the other Individual Defendants, as alleged herein.

114. Defendant Templeman, as the Sergeant on scene, both directed and personally caused this incident, and also oversaw and approved the actions of the other Individual Defendants.

115.    Each Individual Defendant, even if not the superior officer on scene, had a duty to intervene and prevent this tragedy from occurring, *i.e.,* by refusing to hand Chase the car keys, or insisting on another safe alternative (such as transporting Chase home and releasing him to his mother). They failed to do so, abdicating their duty to intervene and also personally participating in causing this incident.

116.    Even if they did not personally hand Chase his car keys, each Individual Defendant is liable for failing to intervene to prevent that from occurring despite having opportunity to do so.

117.    Giving Chase his car keys and releasing him into the cold night, isolated and unsafe, as alleged herein, was a course of action each Individual Defendant participated in making, agreed with both verbally and non-verbally with the other officers present, and jointly agreed upon and coordinated to carry out.

118.    Any of the Individual Defendants could have and should have spoken up and acted to stop this from happening, as was their duty. Instead, each actively participated jointly and in coordination.

119.    Each Individual Defendants is therefore liable both as a direct participant and for failure to intervene.

**Loveland's Failed Policies, Procedures, Practices, Training, And Supervision**

120.    Defendant Loveland implemented and endorsed standard policies, procedures, practices, supervision and training which were a moving force in causing this deprivation of rights and Plaintiff's damages. Loveland is liable in multiple ways.

121.    Loveland officials made a number of excuses to Amber and the rest of Chase's

devastated family as they failed to take responsibility for their failures, which only buttresses the evidence of Loveland's liability for this tragedy.

122.    First, Loveland is liable because the Individual Defendants' conduct is the product of Loveland's policies, practices, training, and supervision, particularly given the number and rank of officers involved. Supervisors including Defendant Sergeant Templeman directly participated in and oversaw these events, showing the actions of all were consistent with Loveland customs, practices, training and supervision. Moreover, Defendant Hasani was participating in training at the time, and the conduct of these Individual Defendants was shockingly used as an example of training and appropriate actions by police officers, further showing it consistent with Loveland's policies, practices, training and supervision. No Individual Defendant was disciplined for their misconduct, and each is expected to testify they acted pursuant to their training and Loveland's standard practices and procedures.

123.    Second, Loveland is liable because Individual Defendants acted pursuant to Loveland's accepted practices and customs—practices which violated and were contrary to what they knew, and what Loveland knew, to be lawfully required. The Individual Defendants knew Chase should be held in a detox facility or other safe location—but intentionally failed to take him to such a location, either due to inconvenience or other improper basis, and ignoring the fact that they could have transported Chase to other medical facilities, kept him custody of police, or transported to his home to the care of his mother, a responsible adult.

124.    Third, Loveland is liable because as a policy the department requires acceptance of responsibility and liability for intoxicated individuals released, and in releasing Chase, Loveland and its officers bore the burden of *at least* the same level of responsibility as a private

26

citizen. If private citizens are expected to be responsible for the actions of intoxicated adults and ensure they do not drive, professional LPD police officers are certainly so liable, pursuant to Loveland's own policies and practices. Loveland is liable for the practice and custom of officers' failure to adhere to this basic duty, putting Chase's life and public safety at risk.

125. Fourth, Loveland officials and police department supervisors have variously claimed to Chase's family that department understaffing was a cause, claiming Loveland only has so many officers and could not have ensured Chase was released to his family at home or at another safe location, instead of alone in the Colorado night after giving him his car keys. These admissions indicate Loveland was endorsing a practice of Individual Defendants failing to perform required duties out of a claimed staffing concern, rather than meeting constitutional obligations to Chase or to the public.

126. In any event, Loveland's claimed staffing excuse holds no water, because Individual Defendants did have the time and ability to quickly transported Chase home while he was in custody, and released Chase to his mother as a responsible party. Chase's home was a mere 5-minute drive from the Arby's.

127. Fifth, Loveland officials and police department supervisors also claimed the excuse to Chase's family that the city lacked a "drunk tank" or detoxification facility or other location to take an intoxicated young man like Chase. These claims are false, as by law the city is required to safely take into custody and transport individuals pursuant to Colorado law, whether or not the facility is in Loveland or nearby or at a further location.

128. Additionally, Chase could have been kept in custody of police at another safe location even if not a detox facility, or could have been safely transported home as alleged

27

herein. Loveland's claimed excuses amount to admissions of the failure of policy, practice, and training to ensure officers safely release intoxicated people, particularly underage youth at risk of self-harm like Chase was that night.

### Accepted Practices Violating Loveland's Stated Official Policies

129. Loveland is also liable because it endorsed standard practices as occurred in this case which violate Loveland's claimed official policies. This demonstrates Loveland's deliberate indifference to the consequences of official policies violations, and endorsement of practices and customs which violate these policies and put people like Chase and the public at serious risk of harm.

130. Loveland holds itself out publicly as committed to public safety and that "people feel safe" in the community. Loveland holds itself out as committed to reducing vehicle fatalities and injuries through traffic safety and enforcement strategies, including drunk driving risks.

131. Individual Defendants were required to take an oath of office as Loveland officers, to "support and defend the constitution of the United States of America and the laws of the State of Colorado," and to follow the "regulations and policies" of Loveland and its police department.

132. Loveland policies require officers to act to protect the safety of others and of the public, and to protect the rights and safety of individuals.

133. Loveland official policy required Individual Defendants to proceed with incapacitation commitment, holding Chase for his own safety until no longer intoxicated, because there was probable cause to do so and because they had established probable cause for a crime.

134.    Loveland official policy required Individual Defendants "shall" take Chase into protective custody because he was clearly dangerous to himself or others as a result of being under the influence and incapacitated by alcohol, and should have transported him to an appropriate facility, or Chase's home, or if necessary a jail for his own safety.

135.    Individual Defendants violated the letter and spirit of Loveland policy regarding safety of intoxicated individuals like Chase, and safety from drunk driving fatalities, consistent with Loveland's accepted, unwritten practice and custom, and in deliberate indifference to these known and obvious dangers.

136.    It is routine and a near daily occurrence for Loveland officers to contact or respond to calls involving intoxicated individuals, people driving or at risk of driving under the influence, and underage people like Chase in possession of alcohol or intoxicated. Loveland police, including the Individual Defendants, frequently come into contact with individuals experiencing intoxication and crises similar to that experienced by Chase. Death and serious harm are a tragic but preventable result of such crises, including by suicide and self-harm, and by accident, when a response is inadequate. The failure to train the Individual Defendants and other Loveland staff to appropriately act in such scenarios constitutes deliberate indifference to the life and safety of intoxicated individuals in crisis including Chase.

137.    Loveland knew officers including the Individual Defendants would encounter intoxicated underage people like Chase on a frequent, near daily basis, requiring clear training and supervision to correctly respond.

138.    Loveland has held out its police department and officers as embracing the duty to respond to and safely handle intoxication crises and people at risk of driving under the influence.

29

Despite this, Loveland has in reality endorsed failed practices, training, and supervision, in which even intoxicated underage teenagers at risk of harm are endangered.

139.    Due to the well-known fatal risks of drunk driving particularly among underage youth, Loveland knew it had a duty to create and implement adequate policies and training to ensure intoxicated individuals like Chase are not placed at risk of self-harm or other danger.

140.    Loveland and its officials knew that failing to adequately train officers or implement adequate policies and practices regarding handling contacts and arrests of underage intoxicated individuals would result in greater risk of death and other harms like what happened to Chase.

141.    Despite understanding this, Loveland failed to implement such adequate policies, training or supervision. Instead, Loveland endorsed policies and practices which substantially increased the risk of tragic outcomes, and which caused Chase's untimely death.

142.    By not disciplining any Individual Defendant for their conduct resulting in Chase's death, Loveland and its police department confirmed their conduct is within policy and consistent with their training and standard operating procedure for Loveland, as unwritten but accepted policy and practices. This further constitutes ratification of that conduct by Loveland and its chief of police.

143.    Loveland's action and inaction constitute deliberate indifference and callous disregard to the life and safety of persons like Chase Dinkel, who are incapacitated and intoxicated and at serious risk of self-harm or other harm.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983—14th Amendment – *Monell* Claim**
**(Against Defendant City of Loveland)**

144.    Plaintiff incorporates all other paragraphs of this Complaint as if fully stated herein.

145.    Defendant police officers and Loveland officials, at all times relevant were acting under color of state law in their actions and inaction.

146.    Loveland is liable for the unconstitutional policies, procedures, training, supervision, customs, and practices described herein, which led to Plaintiff's injuries.

147.    Loveland is also subject to non-delegable liability for the unconstitutional policies, procedures, training, supervision, customs, and practices of its agents, employees, and contractors, which led to Plaintiff's injuries.

148.    As a result of the allegations contained in this Complaint, Loveland is liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, customs, procedures, decision-making, supervision, and training that resulted in the violation of Plaintiff's Fourteenth Amendment rights, including his right against the deprivation of life and liberty under due process of law.

149.    Loveland knew that these policies, customs, procedures, decision-making, and training, posed an excessive risk of serious harm and death to people in Plaintiff's position, and it was obvious that such serious harm would occur. Nevertheless, Loveland failed to take reasonable steps to alleviate those substantial risks. There is an affirmative causal link between the deliberate indifference of these Defendants towards Plaintiff's protected rights and the policies, procedures, customs, decision-making, and training described herein, which were also

the moving force behind the Defendants' unconstitutional conduct and the moving force resulting in Plaintiff's injuries and damages, including his death.

150.    Loveland is liable for the underlying constitutional violations of the Individual Defendants and any unnamed Loveland agents, for due process violations including officers' affirmative conduct increasing the danger to Chase resulting in his death and resulting in private violence, Chase was a member of a limited and specifically definable group as an intoxicated underage teenager, Defendants conduct put Chase at substantial risk of serious, immediate, and proximate harms which were obvious and known, acted in reckless and conscious disregard of these risks, and which was conscience shocking.

151.    Individual Defendants violated their duties of care to Chase as an in-custody intoxicated youth, pursuant to special relationship doctrine, having held Chase in custody and under arrest.

152.    Loveland is also liable for the systemic violation of Chase's constitutional rights, even if there were no underlying constitutional violation or individual liability, due to the deliberately indifference systemic policies and practices of Loveland alleged herein, including the failure of Loveland to ensure officers utilized an appropriate detox or other facility for protective custody of an underage intoxicated youth like Chase.

153.    The unconstitutional acts and omissions of Loveland were the moving force in the unconstitutional acts of the individual defendants, and the moving force resulting in the injuries and damages suffered by Plaintiff.

154.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered injuries and losses entitling it to recover its compensatory and special damages,

32

including for extreme physical pain and suffering before and during death, loss of constitutional rights, loss of life, all in amounts to be proven at trial.

155.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, including prejudgment interests and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Deprivation of Rights Under the Colorado Constitution**
**(Against all Individual Defendants)**

156.    Plaintiffs hereby incorporate all other paragraphs of this Complaint by reference as if fully set forth herein.

157.    Individual Defendants Brad Templeman, Marcus Vasquez, Nelson Spence, Andrew MacGeorge, and Ben Hasani, acted under color of state law and within the course and scope of their employment as law enforcement officers at all times relevant to the allegations in this Complaint.

158.    At all relevant times, Individual Defendants were "peace officers" under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

159.    Chase Dinkel had a protected interest under article II, § 25 of the Colorado Constitution, in being free from the deprivation of life, liberty, or property without due process of law.

160.    Chase Dinkel had a protected interest in the enjoyment of his life and liberty, and of seeking and obtaining safety and happiness, as a natural, essential, and inalienable right, under article II, § 3 of the Colorado Constitution.

161.    Individual Defendants had a duty as sworn Loveland police officers to protect

33

against and avoid harm to Chase because they reasonably did or should have foreseen that their actions, and failure to act, would involve an unreasonable risk of harm to Chase Dinkel.

162.    Individual Defendants subjected or caused Chase Dinkel to be subjected to the deprivation of individual rights secured by Article II, the bill of rights of the Colorado Constitution.

163.    Individual Defendants affirmatively created and exacerbated danger to Chase Dinkel's life and physical and mental health and well-being through their actions alleged herein.

164.    Individual Defendants violated duties of care to Chase, who was arrested and in their custody, pursuant to the special relationship doctrine, where the harm which befell Chase was foreseeable and obvious and was furthermore consciously known by Individual Defendants.

165.    Individual Defendants did not act upon a good faith and reasonable belief that their acts and omissions regarding Chase Dinkel were lawful.

166.    The acts or omissions of the Individual Defendants were the moving force behind, and the proximate cause of, the death of Chase Dinkel and the injuries sustained by Plaintiff.

167.    Individual Defendants' acts and omissions described herein were done intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Chase Dinkel's constitutional rights.

168.    Plaintiff files this claim for relief pursuant to C.R.S. § 13-17-201(2), and allege that the claim is a good faith, non-frivolous claim filed for the express purpose of extending, limiting, modify, or reversing existing precedent, law, or regulation, and for the express purpose of establishing the meaning, lawfulness, or constitutionality of a law, regulation, or state constitutional right, and the meaning, lawfulness, or constitutionality has not been determined by

34

the Colorado Supreme Court and involves matters of first impression. Plaintiff identifies the state constitutional provisions identified herein, and all laws and regulations referenced in this Complaint, as well as the case of *Leake v. Cain*, 720 P.2d 152, 160 (Colo. 1986) (concluding public official's duty of care for causing harm is determined in the same manner as that of a private party), for purposes of modifying or extending law as required by this statute.

## VII. PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendants, and award Plaintiff all relief as allowed by law and equity, including, but not limited to the following:

a)   Declaratory and injunctive relief, as appropriate;

b)   Past and future economic losses on all claims as allowed by law, including but not limited to lost earnings, funeral and medical expenses, and all other economic losses, in amounts to be determined at trial;

c)   Compensatory and consequential damages, including but not limited to damages for emotional distress, pain and suffering, mental anguish, loss of life, loss of enjoyment of life, humiliation, loss of reputation, and other losses, in amounts to be determined at trial;

d)   Punitive damages on all claims as allowed by law in an amount to be determined at trial against all applicable Defendants;

e)   Issuance of an Order mandating appropriate equitable relief;

f)   Pre-judgment and post-judgment interest at the highest lawful rate;

g)   Attorney fees and costs, including expert witness fees and costs; and

h)   Such further relief as justice requires and as allowed by law.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: March 20, 2026.

Respectfully submitted,

*s/ Stephanie M. Frisinger*

David G. Maxted
Stephanie Frisinger
MAXTED LAW LLC
1543 Champa Street Suite 400
Denver, CO 80202
dave@maxtedlaw.com
stephanie@maxtedlaw.com
303-353-1535

*Attorneys for Plaintiff*